# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

DONALD and ERIN SCHULTZ,     :

     Plaintiffs,     :

vs.     : CA 09-0055-KD-C

SOUTHEAST SUPPLY HEADER,     :
LLC,

     Defendant.     :

## REPORT AND RECOMMENDATION

This matter is before the undersigned for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), on the complaint (Doc. 1), the motion to dismiss and/or strike filed by defendant Southeast Supply Header, LLC (Doc. 4; *see also* Doc. 5), the plaintiffs' response (Doc. 12), the defendant's reply (Doc. 16), and the plaintiffs' response to the defendant's reply (Doc. 19).[1] After consideration of the foregoing pleadings, it is the undersigned's recommendation that the defendant's motion to dismiss and/or strike (Doc. 4) be **DENIED IN ITS ENTIRETY.**

## I.    Background.

As residents of Mobile County, Donald and Erin Schultz own

---

[1]    It is noted that Southeast Supply Header, LLC ("SESH") is seeking summary judgment as to all claims pursuant to a motion filed on March 30, 2009 (Doc. 13). The grounds asserted in the motion for summary judgment are different, however, from those in the motion to dismiss and/or strike.

approximately forty (40) acres of land in Irvington, Alabama, upon which they have a "homeplace and appurtenant structures and improvements[.]" (Doc. 1, p. 1.)  In early 2008, the Schultzes engaged in negotiations with SESH, a Texas-based limited liability corporation, and granted the business entity an easement "for the installation of a natural gas transmission pipeline[.]"  (*Id*.)  In addition to a permanent, 50-foot wide easement over the Schultzes' property in which the pipe was to be buried, SESH acquired "additional easements" to the northwest.  (*Id*.)  These "extra" easements, it appears, amounted to little more than a temporary "workplace easement" so that SESH could actually install the desired length of pipeline under the Schultzes' property.  (*See id*. at 2.)

In the course of installing their pipeline, SESH (1) stripped the land northwest of the Schultzes' parcel of its natural vegetation, (2) put down wood matting to facilitate their progress on the installation, (3) breached the bank of Fowl River Tributary No. 3, and (4) on or about August 15, 2008, moved the matting to the freshly-breached tributary, causing its waters to flood the Schultzes' property.  (*Id*.)  After the change in location/removal of the matting, that is, subsequent to August of 2008, during "rain events the properties of the Plaintiffs was (sic) inundated and converted into a holding pond for the Defendant's easement stormwater runoff."   (*Id*. at ¶ 5)

Donald Schultz tried to bring the matter to SESH's attention on

2

August 20, 2008, alerting the company that "due to the breaching of the creek bank . . . the easement was acting as a conduit or channel for waters from the Fowl River Tributary No. 3 and stormwater onto the properties of the Plaintiffs inundating the unimproved property of the Plaintiffs as well as silting a pond constructed on the property of the Plaintiffs and causing the septic tank system around the homeplace on the properties of the Plaintiffs to malfunction resulting in effluent from the septic tank system and tank to be deposited on the surface." (*Id.* at ¶ 6) In September of 2008, the Schultzes claim that SESH sent a representative to their property who attempted a monetary solution to the Schultzes' grievance, but the Schultzes refused. (*Id.* at ¶ 9)

Initially, after the foregoing notification, the defendant "took no action to alleviate the stormwater runoff and the diversion of Fowl River Tributary No. 3 from the construction site of the Defendant to the properties of the Plaintiffs and the Defendant removed the matting and its equipment and proceeded in a northwest direction with the installation of the natural gas pipeline away from the properties of the Plaintiffs totally ignoring the requests of the Plaintiffs to alleviate and remediate the stormwater runoff and flooding that had occurred to the Plaintiffs' property as a result of the construction." (*Id.* at ¶ 7) After the Schultzes retained counsel in October of 2008 and "communication was tendered to the Defendant concerning the

flooding and sedimentation and destruction of the Plaintiffs' properties resulting from the conduct of the construction activities of the Defendant SESH, . . . steps were taken by [] SESH to remediate the tributary of Fowl River so as to restore the banks, although the stormwater runoff occurring in rain events from the construction site from which the matting had been removed and the vegetation and trees had been removed continued and continues through the date of the filing of this Complaint." (*Id.* at ¶ 8) In sum, plaintiffs contend that SESH's actions have reduced their property to "a holding pond and/or swamp or mud bog" from August 2008 through the current date.  (*Id.* at ¶ 10)

Count One of the complaint is a negligence count which provides, in relevant part, as follows:

10.     That the Plaintiffs' property, which was dry and useable consisting of a homeplace, woodlands and an adjacent unimproved parcel, has as a proximate result of the conduct of the Defendant SESH, been reduced to a holding pond and/or swamp or mud bog for a period of time from August, 2008 through the date of the filing of this Complaint.

11.     That the conduct of the Defendant SESH as described hereinabove constitutes negligence proximately causing the properties of the Plaintiffs to be flooded and rendered unuseable and causing the septic system servicing the homeplace of the properties of the Plaintiffs to discharge effluent on the surface due to the high ground water tables resulting from the conduct of the Defendant, which flooding has proximately caused the following damages:

a.     The properties of the Plaintiffs Donald

4

and Erin Schultz, consisting of approximately forty (40) acres, plus a homeplace, pond, swimming pool and septic tank system, ha[ve] been rendered unsafe and ha[ve] essentially been reduced to a retention pond or holding pond for runoff from the Defendant SESH's construction site and accordingly ha[ve] suffered diminution in value.

b.    The Plaintiffs, Donald and Erin Schultz, have been caused to incur physical pain and discomfort as well as severe inconvenience and mental anguish.

WHEREFORE, Plaintiffs, Donald and Erin Schultz, demand judgment against the Defendant, Southeast Supply Header, LLC, for compensatory damages consisting of diminution in value to their real estate and homeplace and mental anguish damages in the sum of Ten Million and No/100ths ($10,000,000.00) Dollars, plus interest and costs.

(*Id.* at ¶¶ 10-11) Count Two sounds in trespass and attempts to recover compensatory and mental anguish damages of $10,000,000 plus an additional $10,000,000 in punitive damages.  (*Id.* at 5.)  Count Three is a nuisance action seeking compensatory and mental anguish damages of $10,000,000, punitive damages of another $10,000,000, and seeking an order from this Court requiring SESH "to remediate and alleviate the nuisance by improving the right-of-way so as to preclude channelization of water and construction debris onto the property of the Plaintiffs . . . and to remediate and restore the property of the Plaintiffs[.]"  (*Id.* at 6.)  Finally, Count Four brings an inverse condemnation claim  to recover "all statutory damages as per §18-1[A-1], et seq., Code of Alabama (1975), plus attorney's fees and costs as per §18-1[A]-32, Code of Alabama (1975)," to

5

include "the entire value of the property as taken in a non-flooded

condition, plus attorney's fees and costs." (*Id*. at 7.)

SESH filed its motion to dismiss and/or to strike on March 2, 2009.

(Doc. 4)

> 2. The Complaint fails to state a claim on which relief may be granted as to Count Four for inverse condemnation in that it fails to allege that SESH could have exercised the power of eminent domain to acquire the right to conduct the alleged flooding (the only allegation about SESH's condemnation authority being that SESH could condemn rights for installing a pipeline, while paragraph 2 of the Complaint alleged that SESH had already acquired those rights by agreement with Plaintiffs). As a matter of law, an entity cannot be liable for inverse condemnation of rights that it could not have acquired through the power of eminent domain. As a result, Count Four of the Complaint should be dismissed.

> 3. The Complaint fails to state a claim on which relief may be granted as to Count Four for inverse condemnation to the extent that, under Alabama law, inverse condemnation can only be pursued against a governmental entity, and the Complaint fails to allege that SESH is a governmental entity. As a result, Count Four of the Complaint should be dismissed.

> 4. The Complaint fails to state a claim on which relief may be granted as to Count Four for inverse condemnation to the extent that Plaintiff demands mental anguish or emotional distress damages and/or damages consisting of the "entire value of the property as taken in a non-flooded condition" inasmuch as no such damages are allowable as a matter of law in an inverse condemnation action. As a result, Count Four of the Complaint should be dismissed or, in the alternative, any demand for damages over and above what would be allowed in a condemnation action, together with the additional amounts allowed under Ala. Code

§ 18-1A-32, should be stricken.

5.     The Complaint fails to state a claim on which relief may be granted as to the claimed damages for mental anguish or emotional distress in that the Complaint fails to allege that the Plaintiffs were within the "zone of danger" associated with the alleged flooding or that the alleged flooding was accompanied by "insult or contumely." As a result, the complaint should be dismissed, or, in the alternative, the demand for mental anguish or emotional distress damages should be stricken.

6.     The Complaint fails to state a claim on which relief may be granted as to the claim for punitive damages in that it fails to allege the requisite basis for the award of punitive damages as set forth in Ala. Code § 6-11-20, *et seq.* As a result, the Complaint should be dismissed or, in the alternative, the demand for punitive damages should be stricken.

7.     The Complaint fails to state a claim on which relief may be granted in that Count One, seeking recovery for common-law negligence, fails to allege that SESH owed a duty to Plaintiffs or the nature of that duty and, as a result, Count One of the Complaint should be dismissed.

(*Id.* at 1-3) The plaintiffs filed their response in opposition to the motion to dismiss and/or strike on March 20, 2009 (Doc. 12), the defendant its reply on April 6, 2009 (Doc. 16), and the plaintiffs their response to the reply on April 21, 2009 (Doc. 19).

## II.     Discussion.

### A.     SESH's Motion to Dismiss

#### 1.     *Standard of Review*

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a

7

defendant may move to dismiss a complaint on the basis that the plaintiffs

have failed to state a claim upon which relief may be granted. *See*

Fed.R.Civ.P. 12(b)(6). A Rule 12(b)(6) motion questions the legal

sufficiency of a complaint (or portions of a complaint); therefore, in

assessing the merits of a Rule 12(b)(6) motion, the court must assume that

all the factual allegations set forth in the complaint are true. *See, e.g.,*

*United States v. Gaubert*, 499 U.S. 315, 327, 111 S.Ct. 1267, 1276, 113

L.Ed.2d 335 (1991); *Powell v. Lennon*, 914 F.2d 1459, 1463 (11th Cir.

1990). Moreover, all factual allegations are to be construed in the light most

favorable to the plaintiff. *See, e.g., Brower v. County of Inyo*, 489 U.S. 593,

598, 109 S.Ct. 1378, 1382, 103 L.Ed.2d 628 (1989).

Rule 8(a)(2) generally sets the benchmark for determining whether a

complaint's allegations are sufficient to survive a Rule 12(b)(6) motion.

*See Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868

(2009) ("Under Federal Rule of Civil Procedure 8(a)(2), a pleading must

contain a 'short and plain statement of the claim showing that the pleader is

entitled to relief.' As the Court held in *Twombly*, . . . the pleading standard

Rule 8 announces does not require 'detailed factual allegations,' but it

demands more than an unadorned, the defendant-unlawfully-harmed-me

accusation.").  Indeed, "[a] pleading that offers 'labels and conclusions' or

'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*,

8

quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955,

1964-1965, 167 L.Ed.2d 929 (2007).  "Nor does a complaint suffice if it

tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*.,

quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1955.

>       To survive a motion to dismiss, a complaint must
> contain sufficient factual matter, accepted as true, to state a
> claim to relief that is plausible on its face. A claim that has
> facial plausibility when the plaintiff pleads factual content
> that allows the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged. The
> plausibility standard is not akin to a probability requirement,
> but it asks for more than a sheer possibility that a defendant
> has acted unlawfully. Where a complaint pleads facts that are
> merely consistent with a defendant's liability, it stops short of
> the line between possibility and plausibility of entitlement to
> relief.

>       Two working principle underlie our decision in
> *Twombly*. First, the tenet that a court must accept as true all of
> the allegations contained in a complaint is inapplicable to
> legal conclusions. Threadbare recitals of the elements of a
> cause of action, supported by mere conclusory statements, do
> not suffice. Rule 8 marks a notable and generous departure
> from the hyper-technical, code-pleading regime of a prior era,
> but it does not unlock the doors of discovery for a plaintiff
> armed with nothing more than conclusions. Second, only a
> complaint that states a plausible claim for relief survives a
> motion to dismiss. Determining whether a complaint states a
> plausible claim for relief will . . . be a context-specific task
> that requires the reviewing court to draw on its judicial
> experience and common sense. But where the well-pleaded
> facts do not permit the court to infer more than the mere
> possibility of misconduct, the complaint has alleged–but it has
> not show[n]–that the pleader is entitled to relief.

*Id*. at ___, 129 S.Ct. at 1949-1950 (internal citations and quotation marks

omitted); *see also id.* at ___, 129 S.Ct. at 1950-1951 (a plaintiff must nudge

his claims "'across the line from conceivable to plausible.'").

## B.    Plaintiffs' Negligence Action

### 1.    *The Elements of a Negligence Claim*

The Supreme Court of Alabama has determined that "[i]n a

negligence action the plaintiff must prove (1) that the defendant owed the

plaintiff a duty; (2) that the defendant breached that duty; (3) that the

plaintiff suffered a loss or injury; and (4) that the defendant's breach was

the actual and proximate cause of the plaintiff's loss or injury." *DiBiasi v.

Joe Wheeler Elec. Membership Corp.*, 988 So.2d 454, 460 (Ala. 2008)

(citation omitted). It is well-settled in Alabama that "'"the existence of a

duty is a strictly legal question to be determined by the court."'" *Id*.

(citations omitted).

### 2.    *Plaintiffs' Statement of the Elements*

In its motion to dismiss and/or strike, SESH makes the argument that

Count One of plaintiffs' complaint "fails to allege that SESH owed a duty to

Plaintiffs or the nature of that duty[.]" (Doc. 4, at ¶ 7) This argument fails for two

main reasons.  First, it appears that SESH has largely abandoned its contention, as

it does not appear in either the defendant's brief in support of motion to dismiss

and/or strike (Doc. 5) or its reply (Doc. 16).  More importantly, it is readily

apparent to the undersigned from reading the numerous factual allegations

contained in the complaint (Doc. 1, at ¶¶ 3-10) that the duty SESH owed to plaintiffs was to install its natural gas pipeline on the easement acquired from plaintiffs in a manner that would not cause damage to any portion of the Schultzes' remaining property.  *Cf. Alonzo v. Sanford*, 465 So.2d 1131, 1134-1136 (Ala.Civ.App. 1984) (in an action sounding in nuisance and trespass, recognizing an implied "reasonableness requirement" as part of an easement agreement and upholding trial court's finding that easement holder had no legal right "to completely divert his water onto [plaintiff's] lot."). As *Iqbal* and *Twombly* explain, threadbare recitals of the elements of a cause of action, are insufficient to survive a motion to dismiss; however, where, as here, the facts have been sufficiently developed for this Court to infer not only the duty owed by SESH to the plaintiffs but, as well, to draw the reasonable inference that the defendant is liable for the misconduct alleged, plaintiffs' negligence claim need survive the defendant's attack. Accordingly, it is recommended that SESH's motion to dismiss count one of the complaint be **DENIED**.

**C.     Plaintiffs' Inverse Condemnation Action**

      1.     *The Elements of an Inverse Condemnation Claim*

The Supreme Court of Alabama set forth the elements of an inverse condemnation claim in *Ex Parte Carter*, 395 So.2d 65, 67 (1980): "Inverse condemnation is defined as the taking of private property for public use

without formal condemnation proceedings and without just compensation being paid by a governmental agency or entity which has the right or power of condemnation." *See Agins v. City of Tiburon*, 447 U.S. 255, 258 n.2, 100 S.Ct. 2138, 2140 n.2, 65 L.Ed.2d 106 (1980) ("Inverse condemnation is 'a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.'").

2.      *The Scope of Inverse Condemnation Actions*

Mindful of these requirements, the defendant contends that Count Four of plaintiffs' complaint fails to state a cognizable claim for relief because it "fails to allege that SESH could have exercised the power of eminent domain to acquire the right to conduct the alleged flooding[.]" (Doc. 4, p. 1-2.)  Stating that "[a]s a matter of law, an entity cannot be liable for inverse condemnation of rights that it could not have acquired through the power of eminent domain[,]" SESH opines that because it could not have acquired the right to flood the Schultzes' property, an inverse condemnation action does not lie.  (*Id*. at 2.)

In support of this argument, SESH first points to *Carter*, *supra*. Although SESH's encapsulation of the holding of that case in their supporting brief (Doc. 5) appears accurate, the undersigned remains unconvinced of *Carter*'s import on the current proceedings (*see id.* at 4-5).

12

In *Carter*, the plaintiff was charged with "possession of coons during closed season without a permit," and so encountered the unhappy prospect of either releasing all of his raccoons in Lauderdale County, Alabama, or facing 243 separate counts of illegally possessing the small nocturnal carnivores. 395 So.2d at 66.  In holding that the suit did "not lie under an inverse condemnation theory," the Supreme Court of Alabama focused on the Department of Conservation's "lack of power to condemn animals," and held that "[a]lthough the Department has the express power to acquire real property by condemnation . . . nowhere is it expressly authorized to acquire privately-owned animals or other personal property by condemnation."

*Id*. at 67.

The distinction made by the *Carter* Court– between real and personal property– is inapposite to SESH's argument because here, SESH indisputably had the authority to condemn real property for the necessary right-of-way to construct, operate, and maintain a pipeline for the transportation of natural gas, as reflected not only in  15 U.S.C. § 717f(h) ("When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of

13

natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, ***it may acquire the same by the exercise of the right of eminent domain*** in the district court of the United States for the district in which such property may be located, ***or in the State courts***. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated[.]"), but as well in numerous sections of the Alabama Code, *compare* Ala. Code § 10-5-1 ("Corporations formed for the purpose of constructing, operating or maintaining railroads, street railroads, gas or electric works, water companies, power companies, canals, terminals, bridges, viaducts, wharves, piers, telegraph or telephone lines, pipelines or any other work of internal improvement or public utility ***may exercise the power of eminent domain in the manner provided by law***.") *with* Ala. Code § 10-5-4 ("Street railroad companies, telegraph, telephone, water, gas, electric, power, canal, pipeline companies and all other companies formed for constructing, operating or maintaining any work of internal improvement or public utility ***may acquire by condemnation for a right-of-way for their*** railways, lines, tunnels, canals, dams, ***pipelines***,

14

excavations or works, lands for ways and rights-of-way **not exceeding 100**

**feet in width throughout the entire length of such** railways, lines, tunnels,

canals, dams, **pipelines**, excavations or works, **together with the right to cut**

**down such trees as might, by falling, injure the same, together with the**

**necessary lands, other than lands for ways and rights-of-way, for the**

**construction or installation of facilities, apparatus or equipment**

**necessary for the operation of such** railways, lines, tunnels, canals, dams,

**pipelines**, excavations or works."). Stated differently, there can be no doubt

that interstate gas pipeline companies like SESH are expressly authorized to

exercise the power of eminent domain. *See, e.g., Walker v. Gateway*

*Pipeline Co.,* 601 So.2d 970, 974 (Ala. 1992). Because SESH has been

expressly authorized to exercise the power of eminent domain, it is clear

that property owners like the Schultzes may avail themselves of the remedy

of inverse condemnation "for the taking or damaging of property by a

condemnor[.]" Ala. Code § 18-1A-32(b); *see also Jefferson County v.*

*Southern Natural Gas Co.,* 621 So.2d 1282, 1287 (Ala. 1993) ("[I]n inverse

condemnation actions, a[n] [] authority need only occupy or injure the

property in question; when that occurs and the property owner discovers the

encroachment, the property owner has the burden of taking affirmative

action to recover just compensation."); *see United States v. Clarke*, 445

U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980) ("To

15

accomplish a taking by seizure, on the other hand, a condemning authority need only occupy the land in question. Such a taking thus shifts to the landowner the burden to discover the encroachment and to take affirmative action to recover just compensation.").

The defendant's statement that "[n]o where [sic] in this statute is it provided that the holder of a certificate, such as SESH, can condemn multiple acres of land adjoining its pipeline right-of-way for the purpose of flooding that land," imparts an absurdly low level of generality to the situation. As previously mentioned, the language from *Carter* plainly contemplates the broad segregation of properties into personal property on the one hand, and real property on the other. In other words, *Carter* was merely observing the obvious truth that condemnors are not "repo men," and as such, do not have the confiscation of personal property within their purview. To hold otherwise would be to debase the import of § 717f(h), *see In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir.2006) ("A basic tenet of statutory construction is that courts should interpret a law to avoid absurd or bizarre results."), as well as consistent Alabama law, *see Walker, supra.*[2]

_____

[2]       In this regard, it is also of no import that SESH successfully negotiated with the Schultzes for the use of the permanent and temporary easements, as not only is the complained-of injury located elsewhere, but the correct focus is on the power, or hypothetical ability, of a condemnor to obtain property through eminent domain. In the case of *State v. Armstrong*, 779 So.2d 1211(Ala.2000), the Supreme Court of Alabama stated: "Clearly, if the condemning

16

2.     *Inverse Condemnation Applicable to Non-Governmental Entities*

SESH next contends that the plaintiffs' inverse condemnation claim need fail because it is a claim that can only be asserted against a governmental authority. In *City of Mobile v. Lester*, 804 So.2d 220 (Ala.Civ.App. 2001), the court stated that "[a]n inverse condemnation claim is a claim against a governmental authority to recover the value of property taken by that governmental authority without exercising its power of eminent domain." *Id.* at 230.  While this language is straightforward, it is off the mark, as the Supreme Court of Alabama, and the wording of Alabama's eminent domain statute, expressly allow for the possibility of a non-governmental entity being subject to a claim for inverse condemnation. *Cf. Walker, supra,* 601 So.2d at 974 ("Pipeline companies, such as Gateway, are expressly authorized by Ala. Code 1975, § 10-5-1, to exercise the power of eminent domain.").   Section 18-1A-3 of the Alabama Code

---

authority has actually or constructively taken more property than it seeks in its condemnation action, the landowner may assert an inverse-condemnation counterclaim to recover just compensation for the additional property taken." *Id.* at 1215.  Although this language from Alabama's highest court stems from a context slightly different from that facing the undersigned, it is readily apparent to the undersigned that Alabama's courts employ a rather generalized level of inquiry when examining the existence of an unlawful taking. *See also Alabama Dept. of Transp. v. Land Energy, Ltd.*, 886 So.2d 787, 792 (Ala. 2004) (notably refraining from delving into specifics when defining "inverse condemnation" as "the taking of private property for public use without formal condemnation proceedings and without just compensation being paid by a governmental agency or entity which has the right or power of condemnation.").

defines "condemnor" as "[a] person empowered to condemn," a definition

which clearly does not limit itself to governmental entities, especially when

one considers that "person" itself is defined by the statute as "a natural

individual, partnership, corporation, association, other legal or fiduciary

entity, and a public entity."  Moreover, the Alabama Supreme Court's

definition of inverse condemnation in *Carter*, *supra*, contemplates that a

non-governmental entity may be subject to a claim for inverse

condemnation. 395 So.2d at 67 ("Inverse condemnation is defined as the

taking of private property for public use without formal condemnation

proceedings and without just compensation being paid by a governmental

agency *or entity which has the right or power of condemnation*."); *see also*

*Land Energy*, *Ltd., supra,* 886 So.2d at 792 (defining "inverse

condemnation" as "the taking of private property for public use without

formal condemnation proceedings and without just compensation being

paid by a governmental agency or entity which has the right or power of

condemnation."). It is clear to the undersigned, then, that the plaintiffs'

claim for inverse condemnation against SESH does not fail by virtue of

SESH's non-governmental status.[3] Accordingly, it is recommended that the

_____

[3] Tracking the language of Article XII, Section 235 of the Alabama Constitution, APJI
14.20  states that "[i]nverse condemnation occurs when a county, city, or other authority with the
power of eminent domain takes or damages property of the plaintiff without resorting to the
powers of eminent domain."  *Id.; see also Alabama Power Co. v. City of Guntersville*, 235 Ala.
136, 177 So. 332, 336 (Ala. 1937) (recognizing the above-referenced language from the

defendant's motion to dismiss Count Four of the plaintiffs' complaint be

**DENIED**.

3.     *Damages Associated With Plaintiffs' Inverse Condemnation*

*Claim*

SESH contends that the plaintiffs' complaint "fails to state a claim

on which relief may be granted as to Count Four for inverse condemnation

to the extent that Plaintiffs demand[] mental anguish or emotional distress

damages and/or damages consisting of the 'entire value of the property as

taken in a non-flooded condition' inasmuch as no such damages are

allowable as a matter of law in an inverse condemnation action." (Doc. 4, ¶

4)[4] While SESH is correct that § 18-1A-170 envisions a plaintiff recovering

for a partial taking "the difference between the fair market value of the

entire property before the taking and the fair market value of the remainder

after the taking[,]" Ala. Code § 18-1A-170(b); *see also City of Tuscaloosa*

*v. Patterson*, 534 So.2d 283, 286 (Ala. 1988) ("The burden is on the

property owner to prove the existence and the extent of the damage to his

_____

Alabama Constitution).

[4]        SESH makes the observation in its brief that it is unsure whether the plaintiffs are
really seeking these damages since "the formal prayer for relief in Count Four merely asks for
the damages allowed under the Alabama Eminent Domain Code, and in particular the damages
allowed under Ala. Code §18-1A-32."  (Doc. 5, at 9; *compare id. with* Doc. 1, ¶ 20
("WHEREFORE, the Plaintiffs, Donald and Erin Schultz, demand judgment against the
Defendant, Southeast Supply Header, LLC, for all statutory damages as per § 18-1[A-1], et seq.,
Code of Alabama (1975), plus attorney's fees and costs as per § 18-1[A]-32[.]"))

property, and the measure of damages is the difference between the value of the property before the work was done and the value afterwards"), it is premature at this point to say that plaintiffs' property has or has not been deemed totally worthless, in which case the full pre-taking value of the parcel may stand as a reasonable prayer for relief, *see* APJI 14.15 (where there has been a total taking of property, the landowners are entitled to recover the reasonable market value of the property taken as of the date the taking). Moreover, it has long been the law in Alabama that "a motion to dismiss is not the proper method to test the recoverability of the damages claimed." *Maples v. The Chinese Palace, Inc.,* 389 So.2d 120, 124 (Ala. 1980). Accordingly, the defendant's motion to dismiss "Count Four for inverse condemnation to the extent that Plaintiffs demand[] mental anguish or emotional distress damages and/or damages consisting of the 'entire value of the property as taken in a non-flooded condition'" (Doc. 4, ¶ 4) is due to be **DENIED**.[5]

**D.     SESH's Motion to Strike**

1.     *Standard of Review*

Federal Rule of Civil Procedure 12(f) provides that a Court can order

---

[5]     The *Maples* decision also answers the defendant's request for this Court to otherwise dismiss the plaintiffs' claims for mental anguish/emotional distress damages and their request for an award of punitive damages.

"any redundant, immaterial, impertinent, or scandalous matter" to be stricken from a pleading.  *See also* Ala.R.Civ.P. 12(f) ("Upon motion made by a party before responding to a pleading . . . the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."). District courts have been bestowed a wide range of discretion in disposing of motions to strike.  *Resolution Trust Corp. v. Youngblood*, 807 F.Supp. 765, 769 (N.D.Ga. 1992) (citations omitted).  Moreover, motions to strike "are not favored in the federal rules," and should not be granted unless clearly warranted.  *Id.* (citations omitted). Indeed, "'motions to strike cannot be used to determine disputed fact questions, nor can they be used to decide disputed and substantial questions of law, particularly where there is no showing of prejudice to the movant.'" *Id*. (citations omitted); *cf. William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2nd Cir. 1984) ("[E]ven when the defense presents a purely legal question, the courts are very reluctant to determine disputed or substantial questions of law on a motion to strike; these questions quite properly are viewed as determinable only after discovery and a hearing on the merits.  To do otherwise would be to run the risk of offering an advisory opinion on an abstract and hypothetical set of facts."), *vacated on other grounds*, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986). Therefore, a motion to strike "will usually be denied

21

unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Beaulieu v. Board of Trustees of University of West Florida*, 2007 WL 2900332, *5 (N.D.Fla. 2007) (citation omitted).  As the sections below will demonstrate, these rather strict requirements for a successful motion to strike have not been met in the instant case.

   2. *Emotional Distress/Mental Anguish Damages, Generally*

  In Counts One through Three of the Complaint (Doc. 1), plaintiffs make the demand for "compensatory damages consisting of diminution in value" and "mental anguish damages" to the tune of $10,000,000.  (Doc. 1, at 5-6.)  SESH, however, asserts that because plaintiffs failed to allege either (1) that they were in the "zone of danger" associated with the alleged flooding of their property, or that (2) the alleged flooding was accompanied by circumstances of "insult or contumely," the complaint should either be dismissed or the demands for recovery based on emotional distress/mental anguish should be stricken.  (Doc. 4, ¶ 5)

  SESH finds authority for its argument in *Birmingham Coal & Coke Co., Inc. v. Johnson*, 10 So.2d 993 (Ala. 2008).  In *Johnson*, a case involving property damage as a result of mine blasting operations, the Court concluded:

  [D]amages for mental anguish and emotional distress are

> proper only in tort cases in which the plaintiff is in the "zone
> of danger" or has suffered a physical injury or the defendant's
> action constitutes wantonness or trespass under circumstances
> of insult or contumely, and because there is no evidence
> indicating that such is the case here, we hold that the trial
> court erred in awarding damages for mental anguish and
> emotional distress.

*Id*. at 1000.  The above language could be restated to say that damages for

mental anguish and emotional distress are proper only in tort cases where:

(1) the plaintiff is in the zone of danger; (2) the plaintiff has actually

suffered a physical injury; (3) the defendant's action constitutes

wantonness; or, finally, (4) the defendant's action constitutes trespass under

circumstances of insult or contumely.  SESH's observation that plaintiffs

neither alleged that they were in the "zone of danger" or that the company's

conduct was accompanied by "insult or contumely" does not remove the

validity of plaintiffs' claim, at this stage of the litigation, because the factual

allegations of the complaint, at the very least, lead to the inference that the

plaintiffs were in the "zone of danger." More importantly, because every

case upon which the defendant relies to establish that reference to such

damages should be stricken was decided following a trial, *Johnson, supra,*

at 1000 ("[W]e hold that the trial court erred in awarding damages for

mental anguish and emotional distress."); *Wal-Mart Stores, Inc. v. Bowers,*

752 So.2d 1201, 1204 (Ala. 1999) ("The jury returned a general verdict for

Tony Bowers and Ann Bowers. Because we cannot ascertain whether some

portion of the jury's award was intended as damages for Tony Bower's claimed mental anguish, or, if so, what portion, we must reverse the judgment of the trial court and remand the case for a new trial."); *White Consolidated Industries, Inc. v. Wilkerson*, 737 So.2d 447, 449 (Ala. 1999) ("The trial court erred in allowing the jury to award damages to the Wilkersons based on their claim of mental anguish. Because it is impossible for this Court to determine what portion of the Wilkersons' total award against WCI the jury intended as compensation for the Wilkersons' property damage and what portion the jury intended as compensation for the Wilkersons' mental anguish, we reverse the judgment for the Wilkersons and remand the cause for a new trial or other proceedings consistent with this opinion."); *AALAR, Ltd., Inc. v. Francis*, 716 So.2d 1141, 1142 (Ala. 1998) ("One of the defendants below, AALAR, Ltd., Inc. [] appeals from a judgment entered on a $60,000 jury verdict for the plaintiffs, C.J. Francis and his mother, F.N. Francis, in this action based on allegations of negligence and wantonness."), the undersigned recommends that the Court find that it is much too early in the litigation to strike the plaintiffs' claims for emotional distress/mental anguish damages, or find that same cannot be awarded as a matter of law, because plaintiffs should be extended the opportunity, through the discovery process, to flesh out their damage claims. Certainly, there is no viable assertion that the defendant

24

will be prejudiced by this Court allowing plaintiffs' claims for emotional

distress/mental anguish damages to remain a part of their complaint until

after the close of discovery. Stated differently, because the plaintiffs' claims

for emotional distress/mental anguish damages cannot be found to be

"redundant, immaterial, impertinent, or scandalous," a motion to strike--like

a motion to dismiss--is not a proper vehicle for challenging the plaintiffs'

claims for those damages. *Jefferies v. Bush*, 608 So.2d 361, 363 (Ala. 1992)

("[T]he Jefferieses' claim for mental anguish damages cannot be said to be

'redundant, immaterial, impertinent, or scandalous.' Therefore, a 'motion to

strike' was not the correct vehicle for challenging the Jefferieses' claim for

mental anguish damages.").[6] Accordingly, it is recommended that the

defendant's motion to dismiss and/or strike plaintiffs' claims for emotional

distress/mental anguish damages be **DENIED**.

    3.    *Punitive Damages Recoverable*

       Mirroring their argument regarding plaintiffs' claims for damages

based on mental anguish and emotional distress, SESH posits that the

complaint fails to state a claim on which punitive damages may be awarded

because it does not allege, consistent with § 6-11-20 of the Alabama Code,

---

[6]     This conclusion is equally applicable to defendant's attempt to have this Court strike from plaintiffs' inverse condemnation claim their request for mental anguish/emotional distress damages.

that it "engaged in 'oppression, fraud, wantonness, or malice.'" (Doc. 5, at 14)

Section 6-11-20(a) provides that punitive damages may not be awarded in a tort action unless "it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." The statute defines "wantonness," as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code § 6-11-20(b)(3). The allegations in the plaintiffs' complaint that the defendant initially took no action to alleviate the stormwater runoff and the diversion of Fowl River Tributary No. 3, but instead ignored the requests to take such affirmative action, and that its later actions did not alleviate stormwater runoff (Doc. 1, at 3-4), arguably fit the statute's definition of wantonness, at least at this juncture; therefore, the  undersigned is convinced that plaintiffs' claims for punitive damages must survive the motion-to-dismiss stage of litigation. *See IMAC Energy, Inc. v. Tittle*, 590 So.2d 163, 169 (Ala. 1991) ("Punitive damages may be awarded when the actions complained of are willfully or wantonly committed in disregard of the rights of others.  The issue of whether the defendant's conduct was committed willfully, wantonly, or intentionally is a question for the jury on the issue of punitive damages, and prior or subsequent acts may be

considered for the purpose of determining the defendant's intent."). Accordingly, the undersigned recommends that the Court **DENY** defendant's motion to dismiss or strike plaintiffs' claims for punitive damages at this stage in the litigation. *Compare Jefferies, supra with Maples, supra.*

### III.   Conclusion.

The undersigned hereby recommends that SESH's motion to dismiss and/or strike (Doc. 4) be **DENIED IN ITS ENTIRETY**.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this 19th day of August, 2009.

s/WILLIAM E. CASSADY
UNITED STATES MAGISTRATE JUDGE

27

### MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

l.      *Objection*.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to  do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.